UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

WESTERN DIVISION

| | |
|---|---|
| SHEWAINESH HAGOS EFREM,<br><br>        Plaintiff,<br><br>        v.<br><br>CAROLYN W. COLVIN[1],<br>Acting Commissioner of Social Security,<br><br>        Defendant. | Case No. CV 12-01167 AJW<br><br>MEMORANDUM OF DECISION |

      Plaintiff filed this action seeking reversal of the decision of the defendant, the Acting Commissioner of the Social Security Administration (the "Commissioner"), denying plaintiff's application for supplemental security ("SSI") income benefits. The parties have filed a Joint Stipulation ("JS") setting forth their contentions with respect to each disputed issue.

**Administrative Proceedings**

      Plaintiff filed an application for SSI benefits on March 27, 2009, alleging that she has been disabled since September 26, 2006 due to mental problems, depression, headaches, shoulder pain and knee pain. [Administrative Record ("AR") 118-122]. Plaintiff's applications were denied initially and upon reconsideration. [JS 2; AR 11-21]. Plaintiff requested an administrative hearing, which was conducted

---

[1] Carolyn W. Colvin is substituted as defendant in place of her predecessor in office, Michael J. Astrue. See Fed. R. Civ. P. 25(d).

1 before an administrative law judge (the "ALJ") on April 29, 2010. [AR 11]. Plaintiff was represented by counsel during the hearing and testified on her own behalf. [AR 28-45]. Testimony also was received from a vocational expert. [AR 46-50].

On August 24, 2010, the ALJ issued a written decision denying plaintiff's application for benefits. [AR 11-21]. The ALJ found that plaintiff had the following severe impairments: back disorder and history of pubic and sacrum fractures. [AR 14]. The ALJ determined, however, that plaintiff's impairments, singly or in combination, did not meet or equal an impairment included in the Listing of Impairments (the "Listing"). [AR 17]. See 20 C.F.R. Pt. 404, Subpt. P, App. 1. The ALJ further found that plaintiff retained the residual functional capacity ("RFC") to perform light work with minor limitations, and therefore could not perform her past relevant work as a home attendant, certified nurse aide, and patient escort. [AR 18-19]. Based on the testimony of the vocational expert, the ALJ determined that plaintiff could perform alternative jobs that exist in significant numbers in the national economy. [AR 20]. The ALJ therefore concluded that plaintiff was not disabled at any time up to the date of his decision. The Appeals Council denied plaintiff's request for review. [AR 1-3].

**Background**

Plaintiff was born in 1957, and she was 52 years old when the ALJ issued his decision. [AR 19]. Plaintiff had a high-school education and past relevant work as a home attendant, certified nurse's assistant, and patient escort. [AR 19, 47]. Plaintiff testified that she briefly worked in 2007 moving people in wheelchairs at the airport, but had to leave that job due to her health problems; and because she would " get confused" and had "driving problems." [AR 35-38].

The testimony and documentary evidence of record establishes that plaintiff was in an automobile accident in 2003 as a pedestrian. [AR 14, 395-411]. As a result, she suffered a traumatic brain injury and multiple fractures to her face and left side of her body. [AR 14, 448-457]. Plaintiff received treatment from Rancho Los Amigos National Rehabilitation Center from August 2003 through the date of the hearing in April 2010 for headaches, pain, orthopedic limitations, incontinence, memory problems, and dizziness. [AR 14, 40, 171-215, 257-266, 601-635]. Plaintiff began receiving mental health treatment from Samia Michaiel, M.D., at Hollywood Mental Health ("HMH") in December 2006, and continued to attend monthly medication appointments as of the date of the hearing. [AR 14, 40-41, 216-256, 319-380].

Plaintiff underwent a consultative psychological evaluation on June 11, 2009 with Ahmad Riahinejad, Ph.D. Plaintiff's verbal IQ, performance IQ and full scale scores placed her within the moderately mentally retarded range of intellectual ability, but Dr. Riahinejad concluded that those results understated plaintiff's current level of functioning. [AR 272]. On both trials of a test of memory malingering, plaintiff obtained a score of 0, which falls in the malingering range. [AR 271]. Based on these test results and clinical data, Dr. Riahinejad concluded that plaintiff was functioning in an undetermined range of intellectual ability. He gave plaintiff a diagnosis of malingering on examination and "[p]ossible depressive disorder, per self-report." [AR 272-273].

On June 25, 2009, plaintiff underwent a consultative internal medicine evaluation at the Commissioner's request with John Sedgh, M.D. [AR 278-287]. Dr. Sedgh's impression was low back arthritis with limited range of motion, and headaches. [AR 282]. Dr. Sedgh concluded that plaintiff could perform light work. Dr. Sedgh also noted that plaintiff "may need a cane for prolonged walking." [AR 282].

When asked during the hearing to describe her problems, plaintiff explained, "I have problems in controlling my bowel movements and also a problem with my hips. . . and the pains I have in my body, my back pain and in my hands." [AR 39-40]. Plaintiff also has daily "severe headaches" and is taking medication for depression and anxiety. [AR 40-41]. Plaintiff stated that her psychiatric medication helped her depression, but said that she still experienced depression and that when it "becomes out of control," her doctor changes her medication. [AR 40-41]. Plaintiff testified that she also had dizziness and memory problems in that she "can't remember what [she] was going to do." [AR 41]. She said that she sometimes saw or heard things that were not there, and that when she did so, she read the Bible and felt better. [AR 40-41].

The ALJ posed a hypothetical question to the vocational expert assuming a person with the same age, education and work background as plaintiff, who is capable of light work, and who needs to use a cane for prolonged walking. [AR 47]. The vocational expert testified that there were jobs available for such a person. [AR 47]. When asked to consider a person who also had difficulty maintaining concentration, maintaining a schedule, or sustaining an ordinary work routine, the vocational expert testified that there would be no jobs that person could perform. [AR 48].

## Standard of Review

The Commissioner's denial of benefits should be disturbed only if it is not supported by substantial evidence or if it is based on the application of incorrect legal standards. Ukolov v. Barnhart, 420 F.3d 1002, 1004 (9th Cir. 2005); Thomas v. Barnhart, 278 F.3d 947, 954 (9th Cir. 2002). Substantial evidence is more than a mere scintilla but less than a preponderance. Richardson v. Perales, 402 U.S. 389, 401 (1971); Thomas, 278 F.3d at 954. Substantial evidence means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Richardson, 402 U.S. at 401 (quoting Consolidated Edison Co. of New York v. N.L.R.B., 305 U.S. 197, 229 (1938)); Thomas, 278 F.3d at 954. The court is required to review the record as a whole, and to consider evidence detracting from the decision as well as evidence supporting the decision. Verduzco v. Apfel, 188 F.3d 1087, 1089 (9th Cir. 1999); Andrews v. Shalala, 53 F.3d 1035, 1039 (9th Cir. 1995). "Where the evidence is susceptible to more than one rational interpretation, one of which supports the ALJ's decision, the ALJ's conclusion must be upheld." Thomas, 278 F.3d at 954 (citing Morgan v. Commr of Social Sec. Admin., 169 F.3d 595, 599 (9th Cir.1999)).

## Statement of Disputed Issues

The disputed issues are: whether the ALJ (1) properly determined plaintiff did not suffer from a severe mental impairment; (2) properly considered plaintiff's impairments either individually or in combination; (3) properly considered plaintiff's testimony; and (4) properly determined whether a significant number of jobs existed that plaintiff could perform. [JS 8-39].

## Discussion

**Severity determination**

Plaintiff contends that the ALJ improperly found that the plaintiff did not suffer from a severe mental impairment. [JS 8].

The ALJ concluded that plaintiff's "medically determinable mental impairment of a mood disorder, not otherwise specified, does not cause more than minimal limitations in the claimant's ability to perform basic mental work and activities and are therefore nonsevere." [AR 16]. In determining the severity of plaintiff's mental impairment, the ALJ considered: (1) plaintiff's mental health treatment records; (2) a March 11, 2010 mental health assessment completed by Dr. Michaiel; and (3) Dr. Riahinejad's consultative

psychological examination report.

"An impairment or combination of impairments may be found not severe *only if* the evidence establishes a slight abnormality that has no more than a minimal effect on an individual's ability to work." Webb v. Barnhart, 433 F.3d 683, 686 (9th Cir. 2006) (internal quotation marks omitted)). To determine whether or not an impairment is severe, the ALJ must determine whether a claimant's impairment or combination of impairments significantly limits his or her physical or mental ability to do "basic work activities." 20 C.F.R. §§ 404.1521 (a), 416.921(a)[2]; see Webb, 433 F.3d at 686-687. Basic work activities are the "abilities and aptitudes necessary to do most jobs," such as (1) physical functions like walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, and handling; (2) the capacity for seeing, hearing, speaking, understanding, carrying out, and remembering simple instructions; (3) the use of judgment; and (4) the ability to respond appropriately to supervision, co-workers, and usual work situations. 20 C.F.R. §§ 404.1521(b), 416.921(b).

The lack of a severe impairment must be "clearly established by medical evidence." Webb, 433 F.3d at 687 (quoting SSR 85-28). The ALJ is required to consider the claimant's subjective symptoms in making a severity determination, provided that the claimant "first establishes by objective medical evidence (i.e., signs and laboratory findings) that he or she has a medically determinable physical or mental impairment(s) and that the impairment(s) could reasonably be expected to produce the alleged symptom(s)." SSR 96-3p, 1996 WL 374181, at *2.

The ALJ concluded that the treatment evidence failed to establish the presence of a severe mental impairment. The ALJ noted that plaintiff was diagnosed with a mood disorder in December 2006 and "was treated with Trazodone[3] and Lexapro[4], with good results." [AR 15, 16 (footnotes added)]. He cited treatment

---

[2] Basic work activities are the "abilities and aptitudes necessary to do most jobs," such as (1) physical functions like walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, and handling; (2) the capacity for seeing, hearing, speaking, understanding, carrying out, and remembering simple instructions; (3) the use of judgment; and (4) the ability to respond appropriately to supervision, co-workers, and usual work situations. 20 C.F.R. §§ 404.1521(b), 416.921(b).

[3] Trazodone is used to treat depression, and is also sometimes used to treat insomnia and schizophrenia. U.S. Nat'l Library of Med. and Nat'l Inst. of Health, MedlinePlus website, available at http://www.nlm.nih.gov/medlineplus/druginfo/meds/a681038.html#why (last visited Mar. 7,

reports from January 10, 2007 and July 31, 2008 indicating that plaintiff was benefitting from medication and was "feeling much better." [AR 15, 16]. The ALJ also observed that plaintiff had not experienced any episodes of decompensation and had not been psychiatrically hospitalized. [AR 16].

The step two inquiry is "'a de minimis screening device [used] to dispose of groundless claims,' and an ALJ may find that a claimant lacks a medically severe impairment or combination of impairments only when [that] conclusion is 'clearly established by medical evidence.'" Webb, 433 F.3d at 687 (quoting Smolen v. Chater, 80 F.3d 1273, 1290 (9th Cir.1996) and SSR 85-28)). The medical evidence in this case does not "clearly establish" that plaintiff has no severe mental impairment.

Although evidence of episodes of decompensation or psychiatric hospitalizations likely would suffice to establish a severe mental impairment, such evidence is unnecessary to pass the "de minimis" severity threshold. See Estrada v. Astrue, 2012 WL 6553768, at *2 (C.D. Cal. Dec. 14, 2012) ("[T]he lack of evidence of psychiatric hospitalization or comparably serious treatment is not dispositive because step two is only a de minimis screening device to dispose of groundless claims.") (internal quotation marks omitted) (citing French v. Astrue, 2010 WL 2803965, at *6 (C.D.Cal. July 15, 2010) ("A claimant may suffer from a mental impairment without having been hospitalized for that limitation. Thus, it appears that the ALJ applied more than a de minimis test and his conclusion at step two that Plaintiff does not suffer from a severe mental impairment was error."); Alsyouf v. Astrue, 2010 WL 5624668, at *3 (C.D.Cal. Jan.21, 2010) (same)).

Furthermore, the ALJ's citation to two mental health treatment reports ostensibly showing a positive response to medication does not fairly or accurately characterize the mental health treatment evidence as as a whole. See Reddick v. Chater, 157 F.3d 715, 722-723 (9th Cir. 1998) (holding that the ALJ impermissibly "developed his evidentiary basis by not fully accounting for the context of materials or all parts of the testimony and reports").

Plaintiff sought mental health treatment from HMH in December 2006 for complaints of depression,

---

2013).

⁴ "Lexapro (escitalopram) is indicated for the acute and maintenance treatment of major depressive disorder in adults . . . ." Forest Laboratories, Inc. website, available at http://www.frx.com/pi/Lexapro_pi.pdf (last visited Mar. 7, 2013).

6

suicidal ideation, headaches, feelings of anger, sadness, memory problems, and insomnia. [AR 234, 244, 255-256].  Dr. Michaiel's treatment records include diagnoses of "depression," "severe depression," or "chronic depression." [See AR 216, 239, 244-248, 251-254, 339-342, 379-380].  On initial mental status examination, plaintiff exhibited impaired memory, irritable and anxious mood, sad and worried affect, tactile and auditory hallucinations, impaired concentration, persecutory or paranoid delusions, and excessive or inappropriate crying. [AR 238].  Dr. Michaiel prescribed Lexapro 10 milligrams daily for depression. Plaintiff already was taking Trazodone and Depakote prescribed by her primary care physician. [AR 244-256].

During her first follow-up visit in January 2007, plaintiff continued to report low energy and motivation as well as trouble sleeping. [AR 254].  She complained of dizziness as a side effect of her medications. Thus, although this report may show some benefit from medication, as the ALJ said [AR 15-16], plaintiff remained symptomatic.  In February 2007, plaintiff "reported feeling better." [AR 253].  In March 2007, Dr. Michaiel noted that plaintiff continued to report feeling sad, low energy, low motivation, and multiple somatic complaints.  She increased plaintiff's dosage of Lexapro to 20 milligrams for "residual depressive symptoms." [AR 252].  In April 2007, Dr. Michaiel wrote that plaintiff "feels ok," "sleeps/eats fairly well," and was "less depressed." [AR 251].

In July 2007, Dr. Michaiel reported that plaintiff was going to visit her "native country" and would reschedule when she returned.[5] [AR 378]. A "discharge summary" dated May 22, 2008 states that plaintiff presented in December 2006 with symptoms of depression, anxiety, auditory and tactile hallucinations, paranoid delusions, suicidal ideation, poor concentration, and poor memory, and that she attended appointments regularly until April 2007, when she left the country to visit family and had not returned.

Plaintiff resumed treatment at HMH on July 3, 2008. [AR 249-250, 368-374]. On mental status examination, plaintiff exhibited lack of pleasure, feelings of worthless and hopelessness, anxiety, auditory hallucinations, impaired concentration and memory, suicidal ideation, and excessive or inappropriate crying. [AR 373].  Dr. Michaiel re-evaluated plaintiff and noted her "long [history of] depression," low energy, and impaired memory and concentration. She restarted plaintiff on Lexapro 20 milligrams daily. [AR 249-250,

---

[5]  Plaintiff testified that she was a naturalized United States citizen. She was born in Eritrea and lived in Ethiopia for many years. [AR 32-33].

368].

During a follow-up visit on July 31, 2008, Dr. Michaiel reported that plaintiff "feels much better." [AR 248]. In September 2008, plaintiff again reported "feeling much better" despite poor medication compliance. She denied behavior problems, and stated that she is sleeping and eating "fairly well." [AR 247]. In December 2008 plaintiff "reported feeling fairly well." [AR 246]. She was directed to return in March 2009. [AR 246].

In a progress note dated March 23, 2009, Dr. Michaiel wrote that plaintiff reported feeling sad and very frustrated by the loss of her purse with a lot of documentation. Her mood was anxious. [AR 245]. It appears that Dr. Michaiel had changed plaintiff's medication to Prozac in or before December 2009. [See AR 356, 361]. In December 2009, plaintiff reported feeling sad and lonely. Her children were not supportive and her social activities were limited. [AR 361]. Dr. Michaiel wrote that plaintiff displayed low energy and motivation and feelings of helplessness and hopelessness. On mental status examination, plaintiff's hygiene was good. She exhibited dysphoric mood with congruent affect, and her speech was slow and low in tone. Dr. Michaiel increased plaintiff's Prozac dosage to 20 milligrams daily "[secondary to] residual mood symptoms." [AR 361]. An undated annual assessment update states that plaintiff "continues to suffer from depression, anxiety, auditory hallucinations, suicidal ideation, impaired concentration, and impaired memory." [AR 336-337]. Plaintiff reported feeling "okay" in February 2010. [AR 360]. She missed her appointment in April 2010, the month in which her administrative hearing was conducted. [AR 358].

Dr. Michaiel described plaintiff's "adherence to medication (compliance)" between 2006 and 2009 as "complete" or "good" on most visits, but occasionally as "partial" or "poor." [E.g., AR 320, 324, 327-328, 331, 333, 339, 379-380]. Although improvement is noted in the treatment reports, plaintiff's response to medication was not consistent or uniform and did not always positively correlate with her level of compliance. For example, in January 2007 plaintiff was completely compliant but exhibited low energy and motivation. [AR 340]. Conversely, in September 2008 plaintiff's compliance was poor, but she was feeling "fairly well." [AR 331]. Other reports show her in partial compliance and feeling sad, as well as complete compliance and feeling better. [AR 327, 333]. In her March 11, 2010 assessment, Dr. Michaiel described plaintiff's prognosis for recovery as "guarded" in part because she experienced the side effect of sedation on recent medications and had to change her medication. [AR 464]. Those treatment reports were consistent

with plaintiff's testimony that she still had some symptoms of depression and that her doctor sometimes had to adjust her medication when her symptoms worsened. [AR 41].

Viewed in the context of the record as a whole, the ALJ overstated the evidence of plaintiff's positive response to treatment and understated the evidence that plaintiff continued to exhibit residual depressive symptoms despite compliance with her medications. Moreover, evidence of improvement in plaintiff's condition does not negate the possibility that her mental impairment was severe. See 20 C.F.R. Part 404, Subpart P, Appendix 1, § 12.00D (stating that an individual's "level of functioning may vary considerably over time.... Proper evaluation of [a mental impairment] must take into account any variations in the level of ... functioning in arriving at a determination of impairment severity over time."); Webb, 433 F.3d at 687 (holding that although there were gaps in the claimant's treatment history, and "the medical record paints an incomplete picture of [the claimant's] overall health during the relevant period, it includes evidence of problems sufficient to pass the de minimis threshold of step two."); cf. Lebus v. Harris, 526 F.Supp. 56, 61 (N.D. Cal. 1981) (explaining that symptom-free intervals do not compel a finding of nondisability arising from a mental impairment because "it is extremely difficult to predict the course of mental illness").

The ALJ also rejected a March 11, 2010 "Report on Individual with Mental Impairment" completed by Dr. Michaiel. [AR 459-464]. Dr. Michaiel reported that plaintiff's speech was slow and low in tone; her appetite and sleep fluctuated; she fell asleep unexpectedly; and she exhibited excessive crying. Dr. Michaiel indicated that plaintiff exhibited the following mental status signs and symptoms: hallucinations, paranoid thinking, depression, anhedonia, appetite disturbance, sleep disturbance, emotional withdrawal or isolation, psychomotor agitation or retardation, decreased energy, feelings of guilt or worthlessness, difficulty concentrating or thinking, thoughts of suicide, memory impairment, anxiety with apprehensive expectation, vigilance, and scanning, recurrent and intrusive thoughts, and persistent disturbance of mood or affect . [AR 459-461]. Dr. Michaiel commented that plaintiff has auditory and tactile hallucinations, thinks people are talking about her, has depression with suicidal ideation, had reduced energy and motivation, felt hopeless and helpless, engaged in excessive crying, displayed anxiety, irritability and poor concentration, and forgot appointments. [AR 462]. Dr. Michaiel opined that plaintiff has "marked" severity of restriction of activities in her daily life, "marked" difficulty in maintaining social functioning, "extreme" deficiencies in concentration or persistence in completing work-related tasks, and "extreme" frequency in experiencing

episodes of deterioration or decompensation. [AR 463]. She recommended ongoing psychiatric medications and described plaintiff's prognosis as "guarded," explaining that "[d]espite ongoing medication treatment, patient continues to experience dysphoric mood, limited social interaction, reduced energy, [and] reduced motivation. Patient becomes easily confused [and] forgetful, unable to organize information, unable to keep regular appointments." [AR 464].

In a "Mental Residual Functional Capacity Assessment" also dated March 11, 2010, Dr. Michaiel rated plaintiff as "markedly limited" in the ability to remember locations and work-like procedures; the ability to understand and remember detailed instructions; the ability to carry out detailed instructions; the ability to maintain attention and concentration for extended periods; the ability to perform activities with a schedule, maintain regular attendance, and be punctual with customary tolerances; the ability to sustain an ordinary routine with special supervision; the ability to work in coordination with or proximity to others without being distracted; the ability to respond appropriately to criticism from supervisors and the ability to complete a normal workday and work week. [AR 466-467]. Plaintiff was "moderately limited" in the ability to understand short and simple instructions; the ability to make simple work-related decisions; the ability to maintain socially appropriate behavior and to adhere to basic standards of neatness and cleanliness; and the ability to interact appropriately with the general public. [AR 466-467].

In a footnote, the ALJ said that he gave Dr. Michaiel's March 2010 assessment "little weight" because "there is no reference to tactile hallucinations by the claimant in any notes of treatment nor is there any indication that she is unable to do anything in her daily living activities." [AR 16 n.3]. By contrast, the ALJ gave weight to Dr. Riahinejad's opinion that plaintiff was "malingering due to her invalid intelligence testing" and to the nonexamining state agency's finding that plaintiff had no severe mental impairment. [AR 15-17; see AR 272-273].

Although not binding on the Commissioner with respect to the existence of an impairment or the ultimate issue of disability, "[t]he opinions of treating doctors should be given more weight than the opinions of doctors who do not treat the claimant." Orn v. Astrue, 495 F.3d 625, 632 (9th Cir. 2007) (citing Reddick v. Chater, 157 F.3d 715, 725 (9th Cir. 1998)); see Tonapetyan v. Halter, 242 F.3d 1144, 1148 (9th Cir. 2001). A treating physician's opinion is entitled to comparatively greater weight because "treating physicians are employed to cure and thus have a greater opportunity to know and observe the patient as an

individual. . . ." Edlund v. Massanari, 253 F.3d 1152, 1157 (9th Cir. 2001) (quoting Smolen, 80 F.3d at 1285 and citing SSR 96-2p). When a treating physician's medical opinion as to the nature and severity of an individual's impairment is well-supported and not inconsistent with other substantial evidence in the record, that opinion must be given controlling weight. Orn, 495 F.3d at 631-632. If contradicted by that of another doctor, a treating or examining source opinion may be rejected for specific and legitimate reasons that are based on substantial evidence in the record. Tonapetyan, 242 F.3d at 1148-1149; Lester v. Chater, 81 F.3d 821, 830-831 (9th Cir. 1995).

Even if Dr. Michaiel's opinion is not entitled controlling weight, her opinion is "still entitled to deference and must be weighed" in light of (1) the length of the treatment relationship; (2) the frequency of examination; (3) the nature and extent of the treatment relationship; (4) the supportability of the diagnosis; (5) consistency with other evidence in the record; and (6) the area of specialization. Edlund, 253 F.3d at 1157 & n.6 (quoting SSR 96-2p and citing 20 C.F.R. § 404.1527)).

The ALJ erred in rejecting Dr. Michaiel's opinion in favor of that of Dr. Riahinejad or the nonexamining state agency physician at step two. It is uncontroverted that Dr. Michaiel was plaintiff's treating psychiatrist from December 2006 through at least April 2010. Her findings are documented in her reports and are consistent with the intake assessments and mental status examination findings made by a HMH social worker. There is no other mental health treatment evidence in the record.

The ALJ said that he gave Dr. Michaiel's March 2010 assessment little weight because "there is no reference to tactile hallucinations . . . in any notes of treatment" [AR 16], but that is incorrect. Plaintiff's initial mental status examination at HMH in December 2006 was positive for tactile hallucinations [AR 354 ("feels choking sensation")] as well as for a number of other signs and symptoms of depression that the ALJ failed to mention. The ALJ also rejected Dr. Michaiel's opinion because plaintiff's treatment notes gave "no indication that [plaintiff] is unable to do anything in her daily living activities." [AR 16]. While plaintiff's intake assessment at HMH states that plaintiff lived by herself and was able to perform activities of daily living, the severity determination comprehends more than just the ability to perform activities of daily living. See 20 C.F.R. §§ 404.1520a(c)-(d); 416.920a(c)-(d). Dr. Michaiel made findings that show more than a slight impairment in other work-related mental functional abilities, such as low energy, low motivation, difficulty concentrating, thoughts of suicide, memory impairment, and feelings of helplessness

or hopelessness.

The ALJ relied in part on Dr. Riahinejad's finding that plaintiff was malingering to find that plaintiff did not have a severe mental impairment. [See AR 16-17]. Unlike Dr. Riahinejad, whose malingering determination was based on a single examination, Dr. Michaiel saw plaintiff frequently enough over a period of years to formulate a "detailed, longitudinal picture" of plaintiff's mental impairments, 20 C.F.R. §§ 404.1527(c), 416.927(c), and she gave no indication that she believed plaintiff was malingering. "Credibility determinations do bear on evaluations of medical evidence when an ALJ is presented with conflicting medical opinions or inconsistency between a claimant's subjective complaints and his diagnosed conditions." Webb, 433 F.3d at 688. However, plaintiff's treating psychiatrist did not "dismiss her complaints as altogether unfounded," and "there is no inconsistency between [plaintiff's] complaints" and Dr. Michaiels' conclusions that is "sufficient to doom [plaintiff's] claim as groundless under the de minimis standard of step two." Webb, 433 F.3d at 688.

While plaintiff may not "succeed in proving that [she] is disabled," the ALJ "lacked substantial evidence to find that the medical evidence clearly established [plaintiff's] lack of" a medically severe mental impairment, Webb, 433 F.3d at 688, and "appears to have applied a more stringent legal standard than is warranted by law." Edlund, 253 F.3d at 1158. Accordingly, the ALJ's step two finding cannot stand.

**Remedy**

The choice whether to reverse and remand for further administrative proceedings, or to reverse and simply award benefits, is within the discretion of the court. See Harman v. Apfel, 211 F.3d 1172, 1178 (9th Cir.) (holding that the district court's decision whether to remand for further proceedings or payment of benefits is discretionary and is subject to review for abuse of discretion), cert. denied, 531 U.S. 1038 (2000). The Ninth Circuit has observed that "the proper course, except in rare circumstances, is to remand to the agency for additional investigation or explanation." Moisa v. Barnhart, 367 F.3d 882, 886 (9th Cir. 2004) (quoting INS v. Ventura, 537 U.S. 12, 16 (2002) (per curiam)).

The proper remedy in this case is reversal and remand for further administrative proceedings to permit the ALJ to provide plaintiff with a supplemental hearing and to issue a new decision with appropriate

findings at each step of the sequential evaluation procedure.[6]

## Conclusion

For the reasons stated above, the Commissioner's decision is not supported by substantial evidence and does not reflect application of the proper legal standards. Accordingly, the Commissioner's decision is **reversed**, and this case is **remanded** to the Commissioner for further administrative proceedings consistent with this memorandum of decision.

**IT IS SO ORDERED.**

March 11, 2013

_____
ANDREW J. WISTRICH
United States Magistrate Judge

---

[6] This disposition makes it unnecessary to consider plaintiff's remaining contentions.